Rufus Bernard NATHAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 61389.

Court of Criminal Appeals of Texas, Panel No. 1.

Jan. 21, 1981.

Rehearing Denied Feb. 18, 1981.

Joe B. Goodwin, Joseph C. Hawthorn, Beaumont, for appellant.

James S. McGrath, Dist. Atty., and John R. DeWitt, Asst. Dist. Atty., Beaumont, Robert Huttash, State's Atty., Austin, for the State.

Before ONION, P. J., and W. C. DAVIS, J.*

## OPINION

ONION, Presiding Judge.

This appeal is taken from a conviction for murder with malice under the former Penal Code (1925). The jury assessed punishment at sixty (60) years' confinement in the Department of Corrections.

In two grounds appellant contends the evidence is insufficient to prove the corpus delicti and also is insufficient to show he was the guilty agent connected with the criminal act alleged. He further urges that the trial court erred in permitting him to be impeached on a matter collateral to any issue in the case.

We are confronted with a voluminous record of over 1,100 pages of testimony. There was no testimony from an eyewitness or accomplice witnesses, if such ever existed. No murder weapon was ever found, and no confession was given. This then is a circumstantial evidence case.

On October 6, 1972, the deceased, Nathan "Blue" Broussard, disappeared. On February 3, 1977, Anthony Osiechi and his wife from South Dakota were vacationing on the Gulf Coast and went to look for shells when they discovered a skeleton on McFaddin Beach between Sabine Pass and High Island in Jefferson County. The authorities were notified.

The skeletal remains were dressed in a green work shirt and pants with a narrow leather belt and a pair of lace-up type shoes with traces of red paint thereon. In the right front pocket were five pennies and two nickels, none bearing a date later than

1971. There were also two keys and a pecan in such pocket. A pocket knife was found in the right rear pocket. In the remains on the left side a two-sided coin purse was found. On one side of the purse there were a silver dollar, a number of half dollars and quarters, none bearing a date later than 1972. On the other side of the coin purse were a number of dimes, none bearing a date later than 1972.

The skeletal remains with the clothing and other objects were transported to Houston where they were examined by Dr. Joseph Jachimczyk, a pathologist and Harris County Medical Examiner. Dr. Jachimczyk testified the skeleton was the remains of a black male human being at least 60 years of age with a height of five feet 10 inches to six feet tall. Other evidence showed this to be the general physical description of the alleged deceased Broussard.

Evidence also established that when last seen Broussard had been wearing a green work shirt and pants and lace-up type shoes stained with red paint which he had used at his work with the City of Beaumont. Relatives generally testified the City of Beaumont patch had been removed from his work clothing prior to his disappearance. His wife identified the clothing and the leather belt as belonging to the deceased. It was also shown the deceased was in the habit of carrying pecans as well as a pocket knife and a coin purse similar to the one found on the remains with dimes on one side and silver coins on the other side. One of the keys found fit the lock on the back door of the alleged deceased's house and the other fit a lock that the deceased had given to his foster son.

The deceased was further known to carry $200.00 to $300.00 in cash with him most of the time. No billfold or wallet was found on the remains.

Dr. Jachimczyk testified that in his opinion the cause of death was a gunshot wound

---

* Judge Leon Douglas, a member of said panel, has retired and did not participate in this panel decision.

of the chest "through and through." This was based in part upon his examination of the shirt on the skeleton. There were numerous holes in the shirt, some caused by fire and some by sea cane or panic grass which had grown through the shirt. Dr. Jachimczyk testified, however, he found two holes that were consistent with bullet holes. One hole was on the shirt's front and the other was on the back in line with the first hole. The fibers around the front hole were bent inward and the fibers around the back hole were bent outward according to the doctor. Dr. Jachimczyk testified that in his opinion the bullet holes were made by a .32 cal. weapon or a smaller weapon. He testified the holes in the shirt referred to were 3/16 of an inch in diameter, and that a .32 cal. weapon would leave a hole .32 inches in diameter. He stated he was an expert on punctures of the human body by gunshot wounds, but neither was an expert on ballistics nor textiles and fabrics. He stated that if the shirt in question had shrunk due to its exposure to the elements the holes could have been made by a .38 or .45 caliber weapon.

He also related he conducted a benzidine test on the said front bullet hole and the reaction was positive, which indicated an 85% probability that the discoloration was human blood. There was no discoloration around the back hole. He admitted there was a 15% probability that a positive reaction to a benzidine test could be due to fruit juices, potato juice, human feces and various vegetable substances.

The doctor also stated a mid-rib bone of the skeleton had a small nick in it. He could not positively testify the nick had been caused by a bullet although consistent therewith. He acknowledged that it could have been caused by a brush or marsh fire that burned the area where the skeleton was found some two months prior to the discovery of the skeleton or that it could simply have been a natural defect in the rib bone.

Dr. Jachimczyk also testified the death occurred on or about October 6, 1972, but could have occurred anytime from October 6, 1972 until four or five months prior to the discovery of the body on February 3, 1977. He explained the soft tissue in a dead body could disappear within four or five months in a coastal area.

He expressed the opinion that the death was a homicide, a murder, since death resulted "at the hand of another." He based this opinion on what peace officers had told him, the scene investigation, where the body was found, etc. On cross-examination the record reflects:

"A ... I am saying this man came to his death at the hand of another.

"Q Whether by accident or otherwise.

"A Right."

Dr. Frank Fisher, a biologist at Rice University, testified that from an examination of the clothing found on the skeleton and the vegetation and topography of the spot where the remains were found the body had been on the beach for several years. He also stated that the holes which Dr. Jachimczyk had said were bullet holes were not caused by sea cane or panic grass which had caused many of the other holes in the shirt.

Turning the clock back to October 6, 1972, the evidence shows that Nathan Broussard left his home to collect a $25.00 debt from Eddie Lee Ford. Ford testified that he saw Broussard about 7:30 or 7:45 a. m. on that date, but he didn't have the money to pay the debt, and that Broussard informed him he (Broussard) was going to see the appellant to collect another debt and "... he was tired of fooling around and wanted his money."

Joseph Taylor testified he was in the vicinity of the Sunlight Baptist Church with Wilfred Benoit and Fred Harris about 9 a. m. on October 6, 1972, when he was approached by Broussard, who inquired as to what time the appellant would return from driving the school bus. He was told about 9 a. m. Later Taylor saw the appellant leave the area in his car with another person whom he could not identify.

Fred Harris testified one morning he was with Taylor and Benoit when Broussard

approached and made an inquiry about the appellant, but he could not recall the date. He did remember that after appellant arrived he (appellant) and Broussard left in appellant's car. Earnest Baloney testified that on October 6, 1972 between 9 and 10 a. m. he saw Broussard and the appellant in appellant's car on Cedar Street in Beaumont stopped at a railroad crossing.

Shirley Little testified she was the Acting Director of the Jefferson County Economic Commission, a Head Start Program, and that the appellant was a bus driver employed by the Program. It was his duty to pick the children up and take them to school in the morning and at 3 p. m. to return them to their homes. On October 6, 1972, she related that appellant called at 2:45 p. m. and asked if someone else could drive the bus that afternoon. Other arrangements were made. She testified that the appellant had from time to time called in to say he could not pick up the children in the afternoon, and his call on October 6, 1972 was not unusual.

She also testified that she was the appellant's girl friend at the time, and that he called her that night but hung up.

When Nathan Broussard did not return home by 8 p. m. on October 6, 1972, his family became worried. He was a man of regular habits and was planning a trip to Louisiana the next day. His wife's knowledge of his planned visit to Ford led to the appellant, who denied being with Broussard, but told the searchers he had last seen Broussard at the Sunlight Baptist Church working on his car. Appellant and others went to the church. They found Broussard's car in working order but did not find him. The police were called.[1] Delores Berry, niece of Nathan "Blue" Broussard, and Leroy Broussard, a nephew, testified that at the time of the search the appellant acted nervous and strange and after a few days did not maintain contact with the Broussard family although previously he had been a close friend.

Leroy Broussard testified that in the early morning hours of October 7, 1972 he and appellant, along with Norris Bluitt, Elmer Harris, Austin Berry and Will Don Berry were searching for his uncle in appellant's car. He stated he noticed a spot on the back seat of the car that looked like blood. He asked appellant what it was and appellant told him it was from a rabbit appellant had killed and thrown back there. On cross-examination he denied calling everyone's attention to the spot. On redirect he said he talked to appellant a day later and that was when appellant first told him the spot was rabbit blood.

Leroy Broussard also testified that while he, the appellant and other men were searching for the deceased the appellant pulled out a pistol from under the seat and showed it to Harris and him stating he didn't worry about people bothering him.

Elmer Harris testified he never heard the appellant say anything about blood or a gun and never saw a gun or a blood spot on the back seat where he was riding. Norris Bluitt testified he did not remember riding with the appellant in the search. There were many inconsistencies as to who was in appellant's car during this search and at what times. Leroy Broussard appeared to be a very confused witness.

Shirley Little further testified that appellant called her on October 7, 1972 and related he was helping friends look for a man and arranged to meet her at the Gaylynn Center. At the Center appellant drove up and gave her an envelope containing $123.00 with "Rent, car note" written on it. She related appellant had paid her car note once before, but had never paid her rent. On October 9th, appellant phoned and told her he was going to the police station to give a statement. On October 10th, officer Henry Austin came to talk to her, and appellant phoned later to inquire what she had told Austin, and that after her conversation with Austin appellant's attitude towards her markedly changed.

1. There was also testimony the relatives had first found the car Broussard had been driving and had called the police before the appellant was contacted.

The record also shows that on October 7, 1972 appellant paid $83.00 on a gasoline bill, that a jewelry store account of $22.40 was paid, and on October 9th he paid the balance of $43.00 in cash on a motel bill on which five days earlier (October 4th) he had paid $50.00 and told the collecting official that he could not pay the full bill. This, together with the money given to Little, amounted to $271.40.

Lt. Bruce Thomason of the Beaumont Police Department testified he searched appellant's car on October 9, 1972 and recovered from the glove compartment a box half full of .32 caliber shells. He observed a substance that looked like blood on the front edge of the back seat.

Detective Wallace G. Daniels testified appellant brought his car to the Beaumont police station on October 9, 1972 and consented to have it taken to a laboratory of the Department of Public Safety for five days. Daniels related the appellant told him he had been rabbit hunting and had thrown a rabbit over into the back seat. This was apparently to account for stains in the car. Daniels testified upon inspection the car appeared to have been washed, wiped clean, and the seats had the appearance of water or some fluid having been used to clean them. Dennis Ramsey, a chemist-toxicologist for the D. P. S., found human blood on a section of floor carpet and on a section of the carpet and floor plug and under the mat from the right rear interior of the car. There was no record of Broussard's blood type and no match up between his blood and the blood found in appellant's car. Other items in the car were shown to have blood on them, but tests could not distinguish whether the blood was animal or human.

Vera Jones testified she met the appellant in November 1975 at the Sunlight Baptist Church some three years after the alleged offense and they "dated" for about three weeks or a month. About December 22, 1975 she told appellant she wanted to terminate their relationship and appellant disagreed and stated he didn't want "to let this get away." The record reflects:

"Q What did he say?

"A Well, he say, I *got* rid of one, *I can get rid of one*—(pause)—*I got rid of one person and I can get rid of another one.*

"Q *What did he say now?* I can get rid of one person—I am sorry, I didn't hear that. *Say it again.*

"A *He said to my face that he can get rid of a person*, get rid of someone and no one would find out.

"Q *He can get rid of a person and not anyone find out?*

"A Yes." (Emphasis supplied.)

The record shows this occurred during a heated argument between Vera Jones and the appellant over their relationship and she later filed a charge of criminal mischief. The conversation was reported to the police at the time.

Dr. Howard Wilcox, M. D., a pathologist, testified for the defense that he examined the shirt found on the skeleton and said the so-called bullet holes described by Dr. Jachimczyk did not appear to him to be any different than any other holes in the shirt. He treated a specimen of sea cane, a vegetable substance which had been introduced into evidence, with benzidine and got a positive reaction.

Orevalt Valrie testified that Vera Jones was his sister and her reputation for truth and veracity was bad. He had personally called the defense after he learned what she had said in court.

Allen Fondrick testified that late in the day on October 6, 1972, just before dark, he saw a man on a pier in the Neches River at the end of Pine Street near the Beaumont Country Club whom he believed to be Broussard. The man was dressed in a green work shirt and pants with a City of Beaumont patch on the shirt. He approached Fondrick and his wife and inquired about their fishing luck. The other men with whom he was with referred to the man as "Broussard." When Fondrick read of Broussard's disappearance in the newspaper the next day or so, he reported his encounter with a Broussard. On cross-ex-

amination it was developed that he couldn't positively identify the picture in the paper as being the man he saw.

Mary Velma Nathan, appellant's wife, testified she was working in the Housekeeping Department at the Red Carpet Inn in Beaumont in October, 1972, and that she made $120.00 per week and $240.00 every two weeks plus tips; that she was usually paid on the 5th and 20th of each month and that she was paid on October 5, 1972. She related she had paid the jewelry company bill of $22.40 and that she and her husband usually paid their bills on Saturday. She testified that in September, 1972 her grandson fell and cut his head while at her mother's house, and that she drove appellant's 1966 Chrysler, yellow with a black top, picked him up and drove him to her home. She related that while he was in the car he bled profusely. The grandson was brought into the courtroom and the witness pushed back his hair and displayed the scar to the jury. She testified that she left work at 4:30 p. m. on October 6, 1972 and that when she arrived home her husband was home cooking supper, which he often did.

Rufus Nathan, age 52, the appellant, testified that he had borrowed $100.00 from "Blue" Broussard and still owed him $35.00 on October 6, 1972. He stated he had known Broussard for 20 years, was a close friend, and did not know how Broussard had come to his death, if he had. He denied doing any harm to Broussard. He related he was a bus driver for the Jefferson County Economic Opportunity Commission and stated when he returned to school on the morning of October 6, 1972 he saw Broussard near the school with the hood of the car up. He said Broussard spoke to him but not about the debt due. He denied that Broussard was in his car with him on that date. He stated that he was home after 4:30 p. m. cooking supper on that date and did not learn that Broussard was missing until about midnight on October 6, 1972.

He admitted he had paid $271.40 on bills shortly after Broussard's disappearance including $123.00 he had given to Shirley Little, and he had paid $43.00 on his Castle Motel bill when he had paid $50.00 a few days before on said bill and didn't have the balance. He related he was usually paid on the 1st and 15th of each month but not later than the 3rd and the 18th of the month. He was not sure what his wife's take home pay was.

He explained that the .32 caliber bullets were left in his car by a friend named "Curley Jack" [2] whose address he attempted to describe.

He denied telling anyone that the blood in the car was rabbit blood. He stated he was not a hunter, and that he told the police that the blood had come from his grandson's head.

He testified that some years after Broussard's disappearance he had an affair with Vera Jones. He related their affair terminated in an argument and that during such argument he disarmed her by taking a .22 caliber pistol from her. He denied the statements she testified he made to her. He admitted he had pleaded nolo contendere to a charge of criminal mischief based upon his attorney's advice.

Officers Austin and Daniels were recalled by the State in rebuttal and testified that appellant never told them that the blood had come from his grandson.

Joann Thomas testified that Vera Jones' reputation for truth and veracity was good.

The defense recalled Leroy Broussard, the nephew of the alleged deceased, to establish that he had told different stories at different times. Bluitt and Harris were also recalled in an attempt to establish the inconsistencies in Leroy Broussard's testimony. There can be no question but that there were inconsistencies in Leroy Broussard's testimony.

It is clear from the above that there was no testimony from an eyewitness or accomplice witnesses, if such ever existed. No murder weapon was ever found, and no confession was given. This is a circumstantial evidence case.

2. Neither the State nor the defense made any effort to call Curley Jack.

In *Flores v. State*, 551 S.W.2d 364 (Tex.Cr.App.1977), this court wrote:

"It is well established that a conviction on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt and proof amounting only to a strong suspicion is insufficient. *Moore v. State*, 532 S.W.2d 333 (Tex.Cr.App.1976); *Higgins v. State*, 515 S.W.2d 268 (Tex.Cr.App.1974); *Indo v. State*, 502 S.W.2d 166 (Tex.Cr.App. 1973); *Flores v. State*, 489 S.W.2d 901 (Tex.Cr.App.1973); *Culmore v. State*, 447 S.W.2d 915 (Tex.Cr.App.1969).

"In circumstantial cases it is not necessary, however, that every fact point directly and independently to the defendant's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. See *Mills v. State*, 508 S.W.2d 823 (Tex.Cr.App.1974); *Herndon v. State*, 543 S.W.2d 109 (Tex.Cr.App. 1976). The rules of circumstantial evidence do not require that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but the hypothesis intended is a reasonable one consistent with the circumstances and facts proved, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. *Jones v. State*, 442 S.W.2d 698 (Tex.Cr.App. 1969); *Taylor v. State*, 87 Tex.Cr.R. 330, 221 S.W. 611, 615 (1920).

"In determining whether incriminating circumstances are sufficient, each case must be tested by its own facts. *Moore v. State*, supra; *Indo v. State*, supra; *Baker v. State*, 447 S.W.2d 172 (Tex.Cr. App.1969); *Ysasaga v. State*, 444 S.W.2d 305 (Tex.Cr.App.1969).

"In *Moore v. State*, supra, it was stated:

"'Ordinarily, the test on appeal is whether there was evidence from which the jurors (advised of the restrictions the law places upon them in condemning one on circumstantial evidence) might reasonably conclude that every reasonable hypothesis other than guilt was excluded. *Ysasaga v. State*, supra (444 S.W.2d 305). Mere presence in the vicinity of a crime, even when coupled with flight, is not alone sufficient to sustain a conviction. *Ysasaga v. State*, supra.'

"In 24 Tex.Jur.2d, Evidence, § 742, p. 422, it is written:

"'In criminal cases, a judgment of conviction, to be sustained on appeal, must be supported by evidence that produces a moral certainty of the guilt of the accused to the exclusion of every reasonable doubt. The evidence will be insufficient to sustain the conviction where, although not leaving the accused free from suspicion of guilt, it still fails to show his guilt to a moral certainty, so as to exclude all reasonable doubt.

"'In ascertaining whether the guilt of the accused has been established to a moral certainty, the appellate court will review the evidence in light of the presumption that the accused is innocent. The court will not presume any acts against the accused that are not shown to have been committed by him. Furthermore, a conviction will not be sustained on appeal if the evidence does not sufficiently establish all material elements of the offense charged....' See also *Culmore v. State*, supra, *Ysasaga v. State*, supra."

See also *Plunkett v. State*, 580 S.W.2d 815, 821 (Tex.Cr.App.1978); *Bonds v. State*, 573 S.W.2d 528, 533 (Tex.Cr.App.1978); *Easley v. State*, 564 S.W.2d 742, 749 (Tex.Cr.App. 1978).

■ With these rules in mind, we turn to appellant's contentions. Appellant initially argues that there was a failure to prove the corpus delicti. There are two elements of corpus delicti in a murder case: (1) the body of the deceased must be found and identified; and (2) the death of the deceased must be shown to have been caused by the criminal act of another. *Self v. State*, 513

S.W.2d 832 (Tex.Cr.App.1974); *Easley v. State,* 564 S.W.2d 742 (Tex.Cr.App.1978); *Shannon v. State,* 567 S.W.2d 510, 514 (Tex. Cr.App.1978). Appellant candidly admits that the circumstantial evidence is sufficient to support the jury's finding that the body of the deceased was found and identified. We agree. He argues, however, the evidence is insufficient to show that the death of the deceased was caused by the criminal act of another. Appellant points out the body had been on the beach so long there was only a skeleton and no normal autopsy could be performed.[3] The only irregularity of the skeleton was a nick in a rib bone which Dr. Jachimczyk testified was consistent with a bullet wound, but could have been a defect in the bone or could have been caused by a brush or marsh fire that occurred in the area where the remains were found. This the appellant claims is not enough. He acknowledges that Dr. Jachimczyk found what he believed to be bullet holes in the shirt, but notes this was contradicted by another doctor's testimony and that the shirt when found was full of holes caused by sea cane, fire, etc., and that it could have been further damaged in being taken to Houston for examination. While a benzidine test on discoloration on the front of the shirt was conducted by Dr. Jachimczyk which was positive and indicated an 85% probability that the discoloration was blood, appellant notes that vegetable substances could give the same reaction and that another doctor who tested sea cane with a benzidine test got the same result and so testified.

Appellant argues Dr. Jachimczyk based his opinion that the cause of death was a gunshot wound upon the nick in a rib bone, certain holes in the shirt and his benzidine test on the shirt's discoloration and that other facts in the testimony explain away this basis.

3. Dr. Jachmiczyk testified that the soft tissue in a dead body would disappear in four or five months in a coastal area.

4. There is a conflict in the testimony of the State's witnesses about the discovery of the car Broussard had apparently been driving. There was testimony the car was found at the church

There can be no question that there is some conflict in the evidence surrounding the second element of the corpus delicti. Assuming, however, that the evidence is sufficient to support the second element, we turn to appellant's contention that even if the corpus delicti has been proven the evidence does not show that he was the guilty agent connected with the criminal act alleged. See *Easley v. State,* supra; *Self v. State,* supra.

In this connection, the State's evidence shows:

(1) The deceased, a man of regular habits who was planning a trip to Louisiana the next day, left his home on the morning of October 6, 1972, to collect a debt or debts. He usually carried $200.00 to $300.00 or more dollars in cash. He never returned home.

(2) The deceased indicated that morning to the witness Ford he intended to see the appellant about a debt due him.

(3) The deceased was placed at the Sunlight Baptist Church on that date inquiring about the appellant.

(4) The deceased was seen leaving the area of the church with the appellant in his car on Cedar Street about 10 a. m. on October 6, 1972. This was the last time he was seen alive.

(5) The appellant called his place of employment at 2:45 p. m. on the date in question and said he could not drive the afternoon school bus.

(6) When the deceased did not return home at 8 p. m. on October 6, 1972, a search led to the appellant, who took relatives to the Sunlight Baptist Church where he claimed he had last seen the appellant working on his car. The car was found there and was in working order.[4] Appellant was described by wit-

prior to the relatives going to the appellant's house. Other evidence indicated appellant took them to the church where they found the car. This may be due to the fact that relatives were not always in one group during the search for the alleged deceased.

nesses as being nervous and acting strange and attempting to lead them on "wild goose chases."

(7) Leroy Broussard testified that while searching for his uncle with the appellant the next morning (October 7, 1972) the appellant had displayed a pistol and stated a spot on the back of his car was rabbit blood. Appellant also told police officers the spot was rabbit blood. When the car was turned over to the police for examination, it appeared to have been washed and the seats appeared to have had water or other fluid used on them.

(8) A chemist testified that some of the stains in appellant's car were of human blood but could not be typed. It could not be determined whether other blood stains were human or animal.

(9) Dr. Jachimczyk testified the bullet holes in the shirt were made by a .32 caliber weapon or a small weapon.

(10) The police found .32 caliber shells in the compartment of appellant's car.

(11) The remains contained coins, etc., as earlier described but no billfold or wallet with cash as normally carried by the deceased was found.

(12) Although the appellant was unable to pay the full amount of a motel bill on October 4, 1972, he was able to pay the balance several days later. And on October 7, 1972, he gave $123.00 to Shirley Little and paid a gasoline bill and other bills about that date. It was shown he spent $271.40 from October 7th through October 9th.

(13) Over three years after the disappearance of the deceased in November, 1975, the appellant told his current girlfriend, Vera Jones, during an argument over the termination of their relationship that he had "got rid of one person" and could "get rid of another" and no one would find out.

Appellant argues the testimony, which he denied, that he was seen with the deceased about 10 a. m. on October 6, 1972, is of no great significance in that the time of death was never established and there was evidence it could have occurred anytime between October 6, 1972 and the summer of 1976. He points to the fact that it was well known that the deceased carried large sums of cash and could have met his demise at the hands of any number of people, and notes the evidence that Broussard was possibly seen at the river with others in the late afternoon of October 6, 1972 after he was seen with the appellant.

Appellant notes the human blood found in his car was never typed so as to establish it was the same type as the deceased, and further notes the defense evidence that blood had come from his grandson's cut. He contends the fact he did not drive the school bus on the afternoon of October 6, 1972 was not an unusual occurrence as testified by his employer. He also notes he was home cooking supper when his wife arrived home after leaving work at 4:30 p. m.

He argues that reliance upon Dr. Jachimczyk's testimony the "bullet holes" were by a .32 caliber bullet or smaller caliber and that .32 caliber bullets were found by police in his car's glove compartment is misplaced. He notes that on cross-examination the doctor stated it was possible the shirt could have shrunk during the time it was exposed to the elements and the "bullet holes" would have decreased in size. Since no evidence was offered as to whether the shirt had shrunk or not the doctor, a non-expert on textiles, admitted the holes could have been made by a .38 or .45 caliber weapon. Thus he argues that the "bullet holes" could have easily been caused by either a smaller or a larger caliber weapon and the "bullet holes" were not the size normally made by a .32 caliber weapon. Further appellant observes that he testified he did not own a .32 caliber pistol and the bullets found in his car belonged to a friend known as "Curley Jack," whose address he gave, and no attempt was made by the State to call such witness or to refute his testimony as to ownership of the bullets.

As for the fact he was seen with a pistol, he notes this testimony came from the deceased's nephew, Leroy Broussard, who told

inconsistent stories on direct, cross and redirect examinations. Leroy stated the appellant had displayed a pistol on the morning of October 7, 1972 when he (Leroy) was in appellant's car with Elmer Harris and Norris Bluitt. Bluitt denied being in the car and Harris stated he was present but appellant never displayed a firearm.

There was no evidence the appellant ever owned a gun. He claimed to be no hunter. There was some evidence he had pawned guns. His wife said he had pawned a gun she bought some time after Broussard's disappearance.

Appellant admitted he spent $271.40 in a few days after Broussard's disappearance including giving $123.00 to Shirley Little. None of the cash, he notes, was traceable to any cash that may have been carried by the deceased. Defense testimony detailed the income of the appellant and his wife and showed they were accustomed to paying their bills in cash at the time of the month in question.

Appellant notes that Vera Jones' testimony concerned an incident occurring on December 22, 1975, over three years after the deceased disappeared. Jones testified as to statements made by appellant during a lovers' quarrel when Jones attempted to terminate the relationship. Jones stated appellant said he had gotten rid of one (without giving a name), etc. Appellant notes when pressed Jones said appellant said he "could get rid of one," speaking of the future. Appellant denied making the statements and related he had to take a pistol away from Jones during the argument. He notes evidence that much bitterness flowed from the incident, and that Jones' own brother testified her reputation for truth and veracity was bad.

Appellant argues that none of the circumstances relied upon to establish his guilt are sufficiently inculpatory in themselves to sustain the conviction; that all the above mentioned circumstances, even when coupled with each other, amount only to proof of a strong suspicion or a mere probability that he committed the murder charged and do not meet the requirements of the law of circumstantial evidence.

As earlier noted, in determining whether incriminating circumstances are sufficient, each case must be tested by its own facts. *Flores v. State*, supra, and cases there cited. This case is no exception.

There can be no question that there are damaging and suspicious circumstances against the appellant. He was the last person seen with the deceased; he had slightly more money in the few days after the deceased's disappearance than could be accounted for by his and his wife's salaries; he apparently lied to the officers when he said the blood in the car was rabbit blood, etc. We need not reiterate all the testimony.

Applying, however, the rules set forth in *Flores v. State*, supra, we conclude that, while the circumstances of the instant case lead to a strong suspicion or probability that the appellant committed the murder, it does not exclude to a moral certainty every other reasonable hypothesis except appellant's guilt as required by the law of circumstantial evidence. We hold that the evidence is insufficient to sustain the conviction.

We need not reach appellant's contention that he was impeached on an issue collateral to any issue in the case. The record shows that on cross-examination appellant was asked if he had had an affair with police officer Buster Turner's wife, or attempted to have sex with her in a taxicab. The appellant was required to answer over the same objection now raised on appeal. The appellant denied the accusations. The State then called Buster Turner, who testified that 20 years before the trial in 1958 he found his wife in a taxicab with the appellant, who was then a taxicab driver, and that appellant had his pants down and his (Turner's) wife was on the floorboard and appellant stated he was "having a little fun." Turner related he shot the appellant and kicked his wife into a ditch. The State claims the appellant opened the door to such impeachment by earlier references to Buster Turner and the incident itself. We

need not resolve that issue. We do observe that the State also sought to establish, over objection, that the appellant had attended voodoo meetings in Louisiana which were not shown to be material to any issue in the instant case.

■ Since this conviction is reversed for the lack of sufficient evidence to sustain the conviction, then no further prosecution may be had in this cause pursuant to holdings of the United States Supreme Court in *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978). These cases are binding upon this court and dictate that once an appellate court has found insufficient the evidence upon which a conviction was based, a second trial upon the same charge is precluded by the Double Jeopardy Clause of the United States Constitution which is applicable to the states by virtue of the Fourteenth Amendment of the United States Constitution. Therefore, we have no choice except to order the prosecution dismissed.

The judgment is reversed and the prosecution is ordered dismissed.