

**NUMBER 13-14-00218-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**CHRISTOPHER ROBIN,**                                            **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                           **Appellee.**

---

### On appeal from the 252nd District Court
### of Jefferson County, Texas.

---

# MEMORANDUM OPINION

### Before Justices Garza, Benavides, and Perkes
### Memorandum Opinion by Justice Garza

A jury found appellant, Christopher Wayne Robin, guilty of murder, a first-degree felony, and sentenced him to fifty-six years' imprisonment. *See* TEX. PENAL CODE ANN. § 19.02(b)(2), (c) (West, Westlaw through 2013 3d C.S).[1]  By a single issue, appellant

---

[1] We note that the judgment incorrectly states that the offense is a second-degree felony.  The reporter's record reflects, however, that the jury was correctly instructed that the offense is a first-degree

contends the evidence is insufficient to support his conviction. We affirm as modified.

## I. BACKGROUND[2]

Testimony at trial established the following facts. Detective James Walters, then a police officer with the City of Port Neches, Texas, testified that he was dispatched to a Port Neches residence around 3:15 p.m. on the afternoon of November 20, 2007. When he arrived at the residence, two other officers were already present. Inside, the officers found the bruised and bloody nude body of Wayne Beavers lying face down on a bed. Beavers had apparently been beaten to death and strangled. There was a considerable amount of blood spatter throughout the house—"a very bloody crime scene." Most of the blood was dried, however, indicating to Detective Walters that it was "not a fresh crime scene." Appellant identified the victim as his roommate. During his investigation, Detective Walters was told that appellant and Beavers had a sexual relationship. Appellant acknowledged that Beavers was gay, but denied that he was involved in a sexual relationship with him. At the time of his death, Beavers was fifty-six years old; appellant was approximately thirty-three.

The house where Beavers and appellant lived was filthy and in disarray. Trash, empty beer cans, and discarded pizza boxes were strewn about. Pill bottles were emptied out on a dresser. Beavers's cell phone—a "flip" phone—was found broken in half with the battery out on the bathroom floor near the toilet. DNA tests later determined that a

---

felony and was correctly instructed as to the punishment range. Accordingly, we modify the judgment to reflect the offense as a first-degree felony. The rules of appellate procedure provide that an appellate court may modify the trial court's judgment and affirm it as modified. TEX. R. APP. P. 43.2(b); *see Banks v. State*, 708 S.W .2d 460, 461 (Tex. Crim. App. 1986) (holding that when an appellate court has the necessary data and evidence before it for modification, the judgment and sentence may be modified on appeal).

[2] This case is before this Court on transfer from the Ninth Court of Appeals in Beaumont pursuant to an order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2013 3d C.S.).

mixture of Beavers's and appellant's blood was found on the cell phone. Appellant told Detective Walters that seven or eight months earlier, Beavers had suffered severe burns to his body due to an accident involving a fire in the barbecue pit.

Later that evening, appellant was taken into custody on an unrelated warrant for possession of marijuana. Detective Walters interviewed appellant at the jail.[3] During the interview, Detective Walters took several photographs of appellant's hands, which showed several cuts and abrasions that were consistent with having been in "a fight." Appellant also had scratch marks on his upper arms. Appellant explained that he had recently suffered the injuries to his hands while working on a house renovation. Appellant stated that he left for work around 7:00 a.m. on the morning of the 20th, and that Beavers was alive at that time. In the course of his investigation, Detective Walters learned that there were "a lot of people in and out of that house." During the interview, Detective Walters asked appellant about the nature of his relationship with Beavers, and appellant became "defensive." Detective Walters identified the clothing that appellant was wearing on November 20th: black denim pants, a white t-shirt, white socks, and white tennis shoes. Samples from the clothing and swabs from the shoes were later submitted for analysis and testing.

Detective Walters learned from appellant that Jimmy Glenn Brown was one of the persons who had been around the house in the days prior to the murder. According to appellant, Brown had been at the house, but Beavers had asked him to leave. Appellant said Beavers dropped Brown off at a bar, but that Brown was arrested shortly after that for public intoxication. Brown was arrested on November 16, 2007, and was not released

_____

[3] An audio recording of the interview was introduced into evidence.

3

until around 10:00 a.m. on the morning of November 20. When Detective Walters talked to Brown, he noticed that Brown's hands had no cuts or bruises on them. Investigators concluded that if Brown committed the murder, he would had to have done so either before November 16 or during a five-hour window between 10:00 a.m. and 3:00 p.m. on November 20. Investigators therefore eliminated Brown as a suspect.

Michelle Smith, who was thirty-nine when Beavers was murdered, testified that she had been friends with Beavers since she was seventeen. Smith said that many friends had lived with Beavers over the years because "[h]e helped anyone that needed it." There were several people who lived at the house in 2007, including Donald Church and his girlfriend, Mike Church, and Jason Jimenez. On November 20, police came to Smith's home asking if she knew Brown. Smith said she did not know Brown. The police said that appellant had suggested that they look for Brown at Smith's house. Smith learned of Beavers's death by listening to the 10:00 p.m. news on the night of November 20. She went to Beavers's home and told Officer Robert Simon that she believed appellant had committed the crime. When Officer Simon asked her why she believed appellant was responsible, Smith said that appellant had tried to kill Beavers on a prior occasion by setting him on fire. Smith said that based on her knowledge as a friend of Beavers, appellant and Beavers had "a very violent relationship."

On cross-examination, Smith admitted that she had not witnessed the incident when Beavers was burned. She stated that there was a "revolving door" aspect to Beavers's house, with numerous friends and acquaintances coming and going.

Dr. Tommy J. Brown, then a forensic pathologist at the Jefferson County morgue, testified that he performed an autopsy on Beavers at 8:00 a.m. on November 21, 2007,

4

the day after the body was discovered. Dr. Brown estimated the time of death as within twenty-four to thirty-six hours or less of the time of the autopsy. Dr. Brown stated that Beavers was apparently "stomped to death." Dr. Brown stated that Beavers's chest was crushed in, his skull was fractured from blunt force trauma, and he had been manually strangled—any or all of these could have caused his death. On cross-examination, Dr. Brown surmised that Beavers "might have been stomped to death, then maybe he was kicked in the head or stomped on the head . . . ."

Steve Mayes, a forensic scientist with the Jefferson County Crime Lab, testified that he participated in the gathering of evidence from the crime scene. Mayes identified various items that were collected and analyzed, including the pieces of the cell phone, appellant's tennis shoes (a pair of white Reeboks, size 6 ½), a pizza box with a bloody shoe impression on it, swabs from the bathroom sink and the kitchen sink, fingernail scrapings from Beavers, appellant's black jeans, and a red shirt and a tan shirt that belonged to Jimmy Brown.

Stacey Shettle, a lab technician with the Jefferson County Crime Lab, testified that she transported the evidence to the DPS crime lab in Houston. Fayth Davis, then a forensic scientist with the DPS Crime Lab in Houston, testified that she analyzed appellant's Reebok tennis shoe and compared it to the bloody imprint on the pizza box at the crime scene. Davis stated that the bloody imprint was made by appellant's shoe.

Andrew McWhorter, a forensic scientist from the DPS Crime Lab in Houston, testified that he prepared State's Exhibits 114 and 115, a "Serology/DNA Report" and "Supplemental Serology/DNA Report," respectively. McWhorter's findings in the "Serology/DNA Report" were as follows. Blood was found on the cell phone swabs,

5

appellant's black jeans, white t-shirt, and shoes, swabs from the front bedroom door, bathroom faucet, and kitchen sink, and Jimmy Brown's red shirt and tan shirt. The DNA on appellant's black jeans and his white t-shirt was consistent with appellant's own DNA profile. A mixture of appellant's and Beavers's DNA was found on the cell phone, appellant's tennis shoe, and the scrapings from Beavers's fingernails.[4] Jimmy Brown's red shirt and tan shirt contained a mixture of Beavers's DNA and that of an unknown individual; appellant was excluded as a contributor to that DNA profile.[5] In the "Supplemental Serology/DNA Report," the following results were found: (1) appellant's DNA was found on the light switch to appellant's bedroom where the body was found; (2) Beavers's DNA was found in a swab from the right hallway wall; (3) a mixture of appellant's and Beavers's DNA was found in a swab from the right hallway wall, the hallway wall off the kitchen, the back bedroom door, and the outside bathroom door knob. A swab taken from the back door knob showed a mixture of DNA, appellant's and an unknown person.[6]

On cross-examination, McWhorter agreed that if a person lives in a house, that person's DNA will be found in the house. At the conclusion of McWhorter's testimony, the State rested.

The defense presented the testimony of Dan Hellwig, the laboratory director of Sorenson Forensics, a private DNA testing laboratory. Hellwig testified that the red shirt

---

[4] The report notes that "apparent blood" was detected on the cell phone swabs and on appellant's shoes. It notes that portions of the swabs "were extracted by a method that yields DNA from tissue such as blood, sweat or saliva." It notes that the fingernail clippings "were swabbed for potential DNA."

[5] Because no DNA sample was collected from Brown, it was not possible to compare the unknown DNA profile to Brown's.

[6] All of these findings were derived from blood evidence.

6

belonging to Jimmy Brown contained a mixture of DNA that was Beavers's and an unknown individual's. The tan shirt that belonged to Jimmy Brown contained a mixture of DNA that was Brown's and possibly Beavers's. The DNA from the tan shirt matched Brown's DNA profile via a DNA Database.

The defense next called Bradley Farr, who lived next door to appellant and Beavers in 2007. Farr testified that he was sitting on his front porch with his laptop on the afternoon of November 20, 2007. Appellant, who appeared to be "shook up," ran up and said he needed to use the phone to call 911 because "something bad" had happened to his roommate. Farr called 911. An audiotape of the call was introduced into evidence. Farr testified that appellant looked "buffed up" and was nervous. Farr noticed that appellant had a cut on his hand. Farr stated that a day or two earlier, a man had come to his door asking for Beavers. Farr said that the man was acting "kinda goofy" and that Farr "wanted him off [his] property."

Henry Russell Robin, appellant's father, testified that he is a truck driver and also does general carpentry and home repair work. Two of his sons, appellant and Thomas, do the same type of work and work with him. On the morning of November 20, 2007, he picked up appellant shortly after 7:00 a.m. and drove to a remodeling worksite in Vidor, Texas about thirty minutes away. When Henry arrived to pick up appellant, appellant was returning from a store across the road. Appellant had purchased a couple of beers for Beavers, as he did every morning. Appellant took the beers in the house and immediately came back out. Henry testified that he, Thomas, appellant, and a couple of other men worked on the site all day. He stated that appellant had cut his hand the day before on the job. Appellant often suffered minor cuts while working, and used black electrical tape

7

or duct tape as a bandage. Around 10:00 a.m., appellant drove the truck to a nearby lumberyard to pick up some materials. He was gone about thirty-five to forty minutes. The police investigation revealed that the lumberyard and paperwork associated with the sale confirmed that appellant made the purchases at the stated time. Henry testified that blood was found on the passenger side of the truck where appellant sat. He stated that the blood likely came from the work-related cut on appellant's right hand. The owner of the house that they were working on came by the job site several times a day. Later that night, appellant called to tell him that he had found Beavers's body and that he was being questioned on unrelated charges.

Thomas Robin, appellant's brother, testified that appellant was working at the remodeling site on November 20, 2007. He stated that his hands and appellant's hands were frequently cut up because of the nature of the work they were performing.

Arthur Martin testified that he owned a rental property and had hired Henry Robin to work on the property. He testified that he dropped in to check on the progress of the work on a daily basis. When he dropped by on the afternoon of November 20, 2007, Henry, Thomas and appellant were there. He stated they were "wrapping up" and planning to leave around 3:00 p.m.

Eddie Thomas Oliver III testified that he owned Spanky's Liquor Store in Port Neches, Texas from 2002 to December 2007. Beavers was a regular customer who came in five to six times a day, each time purchasing a single sixteen-ounce Busch beer. Appellant usually came into the store a couple of times per week. Oliver testified that he opened the store at 10:00 a.m. and Beavers was always his first or second customer. Oliver stated that on the morning of November 20, 2007, Beavers came in the store as

usual shortly after 10:00 a.m. and bought a beer. Oliver did not see him again that day.

On cross-examination, Oliver stated that he had given a statement to the police stating that he had seen appellant that day between 10:15 a.m. and noon, but was not "a hundred percent sure" that it was the same day. In his statement to police, Oliver stated that he saw appellant twice that day, once before noon and again around 3:00 p.m. or so. Oliver testified that he was certain about Beavers being there, however, because "he was there every single day every single morning" "like clockwork."

Appellant testified that he grew up in Port Neches and dropped out of school in the tenth grade. He obtained a G.E.D. and did mechanic work and carpentry work. He met Beavers in December 2005 and moved into the house in early 2006. Appellant denied that he was involved in a sexual relationship with Beavers and stated that Beavers's sexual orientation was "about the only thing I didn't really care for him." There was no bed in Beavers's room; he slept on a recliner. Appellant stated the electricity worked in only a few places in the house: a couple of wall sockets in Beavers's room, one socket in appellant's room, and the bathroom; there was no electrical power in the kitchen. The front door of the house was inoperable; the only entry to the house was through the back door. Appellant stated that he did not know Michelle Smith, but knew "of her." He said that Michelle had heard that he set Beavers on fire from "people talking and drinking" and spreading rumors. He said that Michelle came around to visit Beavers maybe twice in the last year and a half. On one occasion, appellant said that Beavers sent him outside to tell Michelle that he was not home because she was always asking Beavers for money.

Appellant testified that Beavers suffered severe burns several months earlier due to an accident. Appellant was lighting some charcoal in the barbeque pit, but had trouble

9

getting a fire started. He took gasoline from the lawnmower and put it into the bottle containing charcoal lighter fluid. The plastic top to the bottle was cracked. After starting the coals, appellant closed the lid to the pit and went to the store. When appellant returned, he saw Beavers standing next to the barbeque pit with a blanket around his shoulders. Beavers opened the pit and squirted gasoline on the coals. Some of the gasoline spilled onto the blanket, engulfing the blanket in flames. Appellant put the flames out and tried to get Beavers to go to the hospital immediately for treatment, but he refused. Beavers was treated at the hospital for the burns several days later.

Appellant stated that he did not own a cell phone; the only phone in the house was Beavers's cell phone. On a typical workday, appellant said his father picked him up to go to work around 7:00 or 7:30 a.m. Typically, Beavers was awake and drinking in his recliner. When he returned from work, appellant usually bought two beers at Spanky's, one for Beavers and one for himself. Appellant stated that he first met Jimmy Brown at Beavers's house.

On the morning of November 20, 2007, appellant's alarm clock did not go off. He was awakened when Beavers threw a shoe against the wall to wake him up. The shoe was appellant's, and he had to go into Beavers's room to retrieve it. Appellant stated that he wears a size nine or nine-and-a-half shoe. Appellant's shoes were in Beavers's room because he and Beavers had watched a movie and drank beer the night before. That morning, appellant helped Beavers get up out of the recliner and get to the restroom.

Appellant stated that Beavers did not eat much and "more or less lived off beer." On the morning of November 20, appellant picked up Beavers's cell phone to call his father, but the battery was dead. Appellant went to the Mobil store across the street,

10

bought two beers and cigarettes for Beavers, and called his father. Appellant stated that the back door to the house was usually left open so the two dogs could go in and out of the house. Two days before the 20th, appellant had cut his thumb working on some flashing. During the workday on the 20th, the cut opened up several times and was bleeding on and off throughout the day.

Appellant stated that after working in Vidor, his father dropped him off at the house around 3:00 p.m. or so. Appellant heard the dogs barking inside the house, which was unusual; normally the dogs were outside in the back yard. The back patio door, which was usually left open, was closed and locked. Appellant opened the door with a key that was hidden nearby. The dogs seemed overly excited to be let out. Appellant put his tools down and went to Spanky's and bought two beers. Appellant set the beers down. Appellant noticed that when the dogs were jumping on him, his hand was "busted open again" and he could feel the blood running down his hand. He went to the bathroom sink to wash the blood off, then went into his bedroom because there was no towel in the bathroom. The room was dark, but he saw what appeared to be Beavers lying face down on the bed. He thought Beavers was passed out drunk, so he kicked the mattress a couple of times; Beavers did not move. He grabbed Beavers by the shoulder and noticed that he had blood all over the back of his head. Beavers felt "cold" and "wasn't moving at all." Appellant said he was "shocked" and looked for the phone in Beavers's room, but it was not there. Appellant had noticed Farr sitting on his front porch, so he ran next door and asked Farr to call 911. The 911 operator instructed appellant to go back in the house to determine if Beavers was still breathing. Appellant leaned over the bed, touched the body with his right hand, and determined that Beavers was not breathing. Appellant then

11

went back to Farr's house. Soon, the police and paramedics arrived. When appellant left the house that morning, his pills were in pill bottles and the dresser drawers were in the dresser. After he found the body, he noticed the pills were spilled out and the drawers were pulled out and on the floor. When the officers arrived, appellant walked back in the house to show the officer the location of Beavers's body.

On cross-examination, appellant stated that, at the time of the murder, only he and Beavers were living in the house. He stated that he did not approve of Beavers's homosexual lifestyle. Appellant said that Beavers slept most of the day and drank most of the night. According to appellant, there were people in and out of the house all the time, and he did not know most of them. Appellant explained that the story that he had set Beavers on fire got started when there were four or five people at the house drinking. Someone joked that appellant set Beavers on fire because Beavers "made a move" on appellant, which angered appellant. According to appellant, everyone knew that it was a joke. Appellant said that the blood on his t-shirt that day was his own blood from his cut hand. Appellant initially disputed that the white size six-and-a-half shoes without laces were his, insisting that he wears a size nine-and-a-half and that the shoes he wore that day had laces. After the prosecutor pointed out that the shoes had paint stains on them, appellant admitted that they were probably his shoes. The prosecutor noted that the shoe print matched the impression on the pizza box. Appellant agreed with the prosecutor that the impression on the pizza box could only have been made when the blood was still wet. Appellant responded that his hand was bleeding so much, it could have been his blood that was responsible for the shoeprint on the pizza box. When asked about the swelling and bruising on his hands, appellant said the bruises were caused by rubbing up against

12

a wall at work and rubbing against brick.  Appellant denied that he was involved in any way with Beavers's murder.

After deliberating for slightly less than three hours, the jury returned a verdict of guilty.  Following the punishment phase, the jury imposed a sentence of fifty-six years' imprisonment.  This appeal followed.

## II. Standard of Review and Applicable Law

In a sufficiency review, courts examine the evidence in the light most favorable to the verdict to determine whether "any rational fact finder could have found guilt beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plural. op.) ("[T]he *Jackson* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt.").  This standard requires reviewing courts to resolve any evidentiary inconsistencies in favor of the judgment, keeping in mind that the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony.  *Brooks*, 323 S.W.3d at 899; *see* Tex. Code Crim. Proc. Ann. art. 38.04 (West, Westlaw through 2013 3d C.S.) ("The jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given to the testimony. . . .").  Appellate courts do not re-evaluate the weight and credibility of the evidence; they only ensure that the fact finder reached a rational decision.  *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009).  A fact finder may support its verdict with reasonable inferences drawn from the evidence, and it is up to the fact finder to decide which inference is most reasonable.  *Id.* at 523.

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327; *see Malik*, 953 S.W.2d at 240. As authorized by the indictment in this case, the State was required to show that appellant (1) intended to cause Beavers serious bodily injury and (2) caused Beavers's death (3) by choking him with appellant's hands. *See* TEX. PENAL CODE ANN. § 19.02(b)(2).

"A person acts intentionally, or with intent, with respect . . . to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (West, Westlaw through 2013 3d C.S.). Murder is a "result of conduct" offense. *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994). "That is, the accused must have intended the result, death, or have been aware that his conduct was reasonably certain to cause that result." *Guzman v. State*, 20 S.W.3d 237, 240 (Tex. App.—Dallas 2000), *rev'd on other grounds*, 85 S.W.3d 242 (Tex. Crim. App. 2002).

It is not necessary that the evidence directly proves the defendant's guilt; "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010). A defendant's intent, in particular, may be inferred from his words, acts, and conduct. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995).

14

In other words, intent and knowledge are fact questions and are almost always proven through evidence of the circumstances surrounding the crime. *Robles v. State*, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984). Both the identity of the accused and the corpus delicti of an offense may be proven by circumstantial evidence. *See Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986); *Clark v. State*, No. 13–10–00496–CR, 2011 WL 3821055, at *4 (Tex. App.—Corpus Christi Aug. 25, 2011, no pet.) (mem. op., not designated for publication); *Wheeler v. State*, 35 S.W.3d 126, 134 (Tex. App.—Texarkana 2000, pet. ref'd).

## III. DISCUSSION

Appellant argues that the evidence is insufficient to support his conviction. Specifically, appellant maintains that he had "logical and reasonable explanations" refuting the State's evidence that he murdered Beavers. Appellant notes that he had "an undisputed alibi" because he was at work from the last time Beavers was seen alive until his body was discovered on the afternoon of November 20, 2007. Appellant argues that "[t]he mere possibility of guilt or even a strong suspicion is not sufficient to support a murder conviction."

We disagree. The jury heard the following evidence: (1) a mixture of Beavers's and appellant's DNA profile was found on Beavers's broken cell phone found on the bathroom floor, appellant's white Reebok tennis shoe, the left hallway wall, the hallway off the kitchen, the back bedroom door, the outside bathroom doorknob, and the scrapings from Beavers's fingernails; (2) after initially denying that the white Reebok tennis shoes were his, appellant admitted that the bloody shoe impression on the pizza box came from his shoe; (3) Davis testified that the bloody impression on the pizza box

15

was made by appellant's shoe; (4) Detective Walters testified that when Beavers's body was discovered after 3:00 p.m., much of the blood was dried and that the crime scene was not fresh, which is inconsistent with appellant's testimony that Beavers was alive on the morning of November 20; and (5) Smith testified that appellant and Beavers had a "violent relationship" and that appellant had previously set Beavers on fire.[7] Although Oliver, the owner of Spanky's, testified that Beavers was in the store around 10:15 a.m. on the morning of November 20, the jury could have believed that he was mistaken. *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) (en banc) (noting that the jury is entitled to reconcile conflicts in the evidence and can choose to believe all, some, or none of the testimony presented by the parties). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

Appellant argues that the absence of evidence in this case is "similar" to the lack of evidence in *Morales v. State*, 466 S.W.2d 293, 304 (Tex. Crim. App. 1970) (op. on reh'g), and *Nathan v. State*, 611 S.W.2d 69, 78 (Tex. Crim. App. 1981). In *Morales*, the evidence showed that three co-defendants were convicted in a joint trial for murder. 466 S.W.2d at 295. It was undisputed that Israel Morales killed the decedent with a knife. *Id.* The issue before the court of criminal appeals, on rehearing, was whether the evidence was sufficient to support one of the co-defendants, Juan Morales's conviction as a principal to murder with malice. 466 S.W.2d at 302. The court found the evidence

---

[7] Although Smith clarified that her beliefs were "based on what [she knew] from being friends with [Beavers]," and was hearsay, we nonetheless consider it. Appellant does not challenge the admission of the evidence on appeal.

insufficient to convict Juan Morales as a principal where there was no evidence that he knew Israel was armed or knew of Israel's intent to kill the victim. *Id.* at 303. Thus, the sufficiency analysis in *Morales* focused entirely on the absence of evidence necessary to find Juan Morales guilty as a principal. *Id.* It provides no guidance as to sufficient circumstantial evidence to support a conviction for murder.

In *Nathan*, the court of criminal appeals found the evidence insufficient to support appellant's conviction for murder where the victim disappeared in 1972 and his skeletal remains were found in 1977. 611 S.W.2d at 70. The evidence showed that: (1) the victim was last seen with appellant; (2) appellant called his place of employment and said he could not come to work on the afternoon the victim disappeared; (3) appellant gave conflicting stories as to the presence of blood stains in his car; and (4) he paid some debts with cash shortly after the victim disappeared. *Id.* at 76–77. The blood stains in the appellant's car were not analyzed for blood type and therefore it could not be determined if the stains were the same blood type as the deceased. *Id.* at 77. In contrast, in the present case, there was a mixture of Beavers's and appellant's DNA found in numerous places: on appellant's tennis shoes, Beavers's cell phone, the left hallway wall, the hallway off the kitchen, the back bedroom door, and the outside bathroom doorknob. In addition, appellant admitted that the dried bloody shoeprint from his shoe on the pizza box must have been made when the blood was wet. We are unpersuaded that the evidence in this case is "similar" to the evidence in *Nathan.*

We find the Fourteenth Court of Appeals' decision in *Owolabi v. State* to be instructive. 448 S.W.3d 148, 152–53 (Tex. App.—Houston [14th Dist.] 2014, no pet.). In *Owolabi*, three individuals forced open the back door to Ranulfo Lopez's house where

17

Lopez and the victim were selling marijuana. *Id.* at 149–50. Lopez saw that one of the individuals had a gun, ran out the front door, and hid in some bushes. *Id.* A short time later, he returned to the house and found the victim bleeding on the floor. *Id.* About the same time, the appellant sought treatment at a nearby hospital for a bullet wound to his cheek. *Id.* Evidence showed that bullets at the crime scene were fired by two different weapons. *Id.* at 151. A twenty-dollar bill found on the appellant contained a blood stain that was consistent with the victim's blood. *Id.* at 152. Also, a blood stain on the appellant's shirt was consistent with the victim's blood. *Id.* Moreover, blood consistent with the appellant's blood was found on the butt of a magazine found at the crime scene, on the floor of the breakfast area in Lopez's house, the laundry room, on the washing machine, on the driveway, and on a nearby road. *Id.* Another witness testified that appellant had confessed that he had been involved in a "robbery that went bad." *Id.* Although the court ultimately determined that the evidence was sufficient to support the appellant's conviction as a conspirator—eliminating the need to determine if the evidence was sufficient to convict as a principal—it noted that the jury was entitled to resolve any conflicts in the testimony in favor of the prosecution. *See id.* at 153.

We also find the present case similar to *Wilson v. State*, No. 05-11-00176-CR, 2012 WL 2149406, at *6 (Tex. App.—Dallas 2012, no pet.) (mem. op., not designated for publication). In *Wilson*, the Dallas Court of Appeals found the evidence sufficient to support the appellant's conviction for murder where the evidence showed that: (1) blood found on the appellant's pants, shirt, keys, and shoes matched the blood of the victims; (2) a bloody shoe print found on one of the victim's bodies matched appellant's shoes;

18

and (3) appellant's cell phone records showed that he was near the crime scene instead of at his place of employment at the time he claimed. *Id.* at *4.

Under the *Jackson* standard, we must defer to the jury's credibility and weight determinations, and we will not disturb those findings here. *See Jackson*, 443 U.S. at 319. We hold that reasonable jurors could have found appellant guilty of murder beyond a reasonable doubt, and that the evidence is therefore sufficient to support appellant's conviction. *See id.* We overrule appellant's sole issue.

## IV. CONCLUSION

We affirm the trial court's judgment as modified.

DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
21st day of May, 2015.