**Reymundo ALANIZ, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–81–00042–CR.**

Court of Appeals of Texas, San Antonio.

May 26, 1982.

Rufino Cabello, Pablo V. Bustamante, Carrizo Springs, for appellant.

Charles R. Borchers, Dist. Atty., Olivero E. Canales, Asst. Dist. Atty., Laredo, for appellee.

Before ESQUIVEL, BUTTS and CANTU, JJ.

## OPINION

BUTTS, Justice.

This is an appeal from a conviction for the offense of murder. The jury assessed punishment at fifty years' imprisonment.

At the outset we consider appellant's challenge to the sufficiency of the evidence to sustain the conviction. Specifically, appellant urges that the trial court's denial of his motion for instructed verdict, both when the State rested and when the State closed its case, constituted error because there was insufficient evidence to prove that appellant committed the offense. We agree with

appellant's contention. In view of our disposition of the case predicated upon this ground we do not address appellant's four remaining grounds of error.

The indictment, omitting the formal parts, alleged that appellant, on or about the 22nd day of July, 1978, "did then and there knowingly cause the death of an individual, Anthony Valdez, Jr., by shooting him with a gun . . . ."

Charged under the provisions of Tex.Penal Code Ann. § 19.02(a)(1) (Vernon 1974), the offense in this case required proof by the State of these elements: 1) A person (appellant) 2) knowingly 3) caused the death of Anthony Valdez, Jr. 4) by shooting him with a gun. *See Branch's, Texas Ann. Penal Statutes*, Vol. 2, § 19.02, p. 13.

The record discloses this is a circumstantial evidence case. There is no direct evidence of the killing. The murder weapon, a gun, was not introduced in evidence, nor were any bullets or casings before the jury. Appellant made no confession.

The record reflects that Valdez was last seen alive on the evening of Saturday, July 22, 1978. Appellant's cousin, Rafael Casarez, who was also the brother-in-law of the deceased, testified that appellant and the deceased came to his mother's home in Laredo, where a barbeque was in progress during the afternoon. He stated that appellant and deceased were drinking beer and having a good time. He remembered that appellant and the deceased left the party and returned more than one time in the deceased's "red car." He stated that before they left together the last time in the 1972 Pontiac Firebird, appellant, who was driving, asked Casarez whether he wanted to accompany them to sell the .22 caliber rifle which was between the front bucket seats by the console.

The police log of the Laredo Police Department documented the first report of the homicide with an entry at 6:26 p. m. on July 22, 1978. One minute later, in response to the dispatcher's call, Laredo police officer Jose Martinez proceeded to a dirt road off McPherson and Calton Roads in the north Laredo area. Three other police officers, the boy who found the body and reported the discovery, and an ambulance arrived about that same time. At the side of the dirt road in a brushy area they saw the body of the deceased lying face up with the legs crossed. Martinez testified that the deceased had an "artificial" right leg and his shirt was torn and bloody. He observed "at least" four bullet holes in deceased's chest, that his face was bloody, that there were two bullet wounds to the head, and that the deceased's throat appeared to be cut. He and the other officers recovered a spent .22 caliber casing from between the deceased's legs. The officers did not make duplicative casts of automobile tire tracks located in close proximity to the body. Martinez stated that motorcycle tire tracks were positioned over part of the automobile tire tracks. The spent .22 caliber casing was not placed in evidence.

State's witness Olga Pena, appellant's sister-in-law, met appellant at Mary's Bar at 6:30 p. m. on that same day. She testified she remembered the time because of the small clock on the wall by the bar. As he entered the bar appellant was shaky and appeared to her to be "very nervous", and that his jeans were wet. Pena stated, his Coors "muscle" shirt had bloodstains on it. She related that the two of them drank beer until 10:00 p. m., at which time they moved up the street to the Bamboo Lounge, where they drank more beer until 2:00 a. m.

At that time the two walked farther north on the same street toward the Woolco parking lot. Pena stated that appellant told her he wanted to take a new battery from a car on that parking lot in order to sell it. They stopped before they reached the lot, she said, because there were police cars on the lot by a red car. She asserted it was not difficult to see the red car from that distance. She related that they left the area after appellant told her the car was "hot because there were cops." Although Pena maintained the two walked away the remainder of the early morning hours, the appellant later related they spent that time in a vacant apartment "having sexual relations."

Pena testified they had coffee at 9:00 a. m. on July 23, 1978, and an acquaintance gave them a ride in his car after appellant gave him some money for gas. They stopped at a store for gas and potato chips. The driver suggested that appellant read a newspaper there. Pena observed appellant become "very nervous" while reading the paper. Later that morning, they went to a friend's house where appellant exchanged his T-shirt for a white shirt belonging to the friend.

Police investigator Candelario Viera testified that he located the red Firebird automobile at 2:00 a. m. on the Woolco parking lot. It was established that a police alert for the missing car had been issued soon after the discovery of the body. The keys were in the ignition. There were bloodstains on the front and back of the passenger's white vinyl seat as well as blood on the seams of the back seat. The carpet was wet, indicating it had been washed. Viera stated he lifted the hood and observed the battery was new.

Viera related that no fingerprints were lifted from any part of the car, nor was there any check of the tires for possible evidence. He removed a section of the carpet. Several days later he took it to the Department of Public Safety laboratory at Corpus Christi, along with appellant's bloodstained T-shirt, and appellant's brown felt hat, for chemical analysis.

Donald Thain, a chemist-toxicologist at the Corpus Christi Department of Public Safety, performed tests on the carpet and confirmed at trial there was blood on it, but he could not determine whether it was human blood. He testified the wet carpet had begun to deteriorate, thus precluding that finding. The T-shirt yielded positive results for human blood; however, his efforts to determine the blood type were thwarted by other pre-existing stains on the shirt. When tested for bloodstains, the hat revealed no presence of blood.

Driving his motorcycle to the Mall del Norte on July 22, 1978, Theodore Garcia, sixteen years of age, saw the deceased's body. He testified he was sure that the time was not yet 6:00 p. m. because he was meeting a friend before 6:00 p. m. He went to his sister's house, and they called the Laredo Police Department.

Dr. Oscar Ramos, a pathologist, testified that he performed an autopsy of the deceased's body at 11:00 a. m. on July 23, 1978. He testified there were two gunshot wounds to the head, one to the left temple region in front of the ear and another to the right temple region just above the ear. He found bruises on the nose and by the mouth. A four inch abrasion or cut was located on the neck with a gunshot wound at its left end by the "Adam's apple." He found four more gunshot wounds in the chest. He testified that the cause of death was massive cerebral destruction resulting from the head wounds. He related he recovered two bullets from the head, and that he locked them in his office. He stated that he was not an expert but that he "assumed" these were the .22 caliber type. The bullets were not in evidence.

The doctor stated that the head wounds, in his opinion, were inflicted from a range of three to four inches. The time of death did not appear on the autopsy report. When asked his opinion, the doctor answered that no rigor mortis had taken place, and he therefore assumed that death occurred less than twenty-four hours before the autopsy. The doctor did not test the deceased for intoxicants.

Appellant presented evidence that on Friday night, July 21, 1978, he was in a hit-and-run accident while driving his father's truck. Norma Dominguez testified that she encountered appellant as he left Mercy Hospital that night. She stated he had bruises on his nose and lips and that his Coors "muscle" T-shirt was bloodstained. Dominguez offered appellant a ride in the car in which she was a passenger. Appellant related to her he had been in an accident and asked to be taken to the Cactus Motel. She left him there.

The custodian of the records at Mercy Hospital, Felipe Sanchez, Sr., confirmed that appellant received treatment in the emergency room at 9:30 p. m. on July 21, 1978, as the result of a traffic accident.

Testifying in his own behalf, appellant related how he and the deceased met before noon on July 22, 1978, and that they rode around all that afternoon in the red car. They visited the home of the deceased's parents about three times. Further, they went to the home of appellant's aunt several times. They went to the deceased's house, where, because the deceased had forgotten his key, appellant climbed through a window. Once inside, the deceased took a shower and got his .22 caliber rifle to take with them for the purpose of selling it. Two other witnesses testified that deceased told them he wanted to sell the gun that day.

Appellant explained that he got another shirt on Sunday from his friend, instead of his own shirt from home, because he was afraid of his father. The fear arose, he said, because of the truck accident on Friday night. He had not gone home since Friday night.

He stated that upon leaving his aunt's house on Saturday evening about 6:00 p. m., he and the deceased drove to Tony's Supermarket and bought some quarts of beer. They drank some and the deceased dropped him off at Mary's Bar. He related that this took about fifteen minutes and that he arrived at Mary's Bar at 6:15 p. m., noting the time on the clock. Appellant stated that he and Pena left the Bamboo Lounge around 1:00 a. m. walking from there to the vacant apartment in front of Cruz Field in the same vicinity. He denied knowing that the red car was on the parking lot and that he told Pena he wanted to get a battery to sell. He testified that he was familiar with a carwash located near Woolco, having used it in the past. He said that he went to the police department on Sunday and "turned myself in for investigation."

An investigator for the District Attorney, Humberto Gutierrez, recounted his journey from the scene of the offense to the carwash near Woolco, and from there, to the Woolco parking lot. It took him thirteen minutes traveling at twenty-five miles per hour. In addition, he testified that the water flow at the carwash lasted four minutes for one time. Mary's Bar is located eight blocks from Woolco. He testified that although it would take about three to four minutes to walk the distance, he did not know how long it might take an intoxicated man.

State's witness Vidal Palacios, employed at the same shopping center where Woolco was located, was asked about seeing a man who brought the red Firebird to the parking lot on Saturday afternoon and left it. The man, according to the witness, wore a brown felt hat. The witness replied, "It could be him [appellant]. I am not sure." When pressed further, "You saw someone that resembled him?", he answered, "Yes, it could be, but I am not sure." It was developed by appellant that the witness was an ex-convict. In addition, the witness testified he told the officers the reason he did not want to come to court was "because I don't feel it is valid enough." He also said, "I do not want to put somebody on the cross."

 It is well established that a conviction on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the accused, and proof amounting only to a strong suspicion is insufficient. *Easley v. State*, 529 S.W.2d 522 (Tex.Cr.App.1975). It is not necessary, however, that every fact point directly and independently to the defendant's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Flores v. State*, 551 S.W.2d 364, 367 (Tex.Cr.App. 1977). The rules of circumstantial evidence do not require that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but that the hypothesis intended is a reasonable one consistent with the circumstances and facts proved, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. *Flores, supra*, at 367. *See Nathan v. State*, 611 S.W.2d 69, 75 (Tex.Cr. App.1981), *Vaughn v. State*, 607 S.W.2d 914, 921 (Tex.Cr.App.1980).

Each case must be tested by its own facts to determine sufficiency. *Nathan, supra* at 75. *Stogsdill v. State*, 552 S.W.2d 481, 486 (Tex.Cr.App.1977). In our role as an appellate court we must review the evidence in the light most favorable to the jury verdict. *Jackson v. State*, 548 S.W.2d 685 (Tex.Cr.App.1977). However, the appellate court in its review will not presume any acts against an accused that are not shown to have been commited by him. A conviction will not be sustained on appeal if the evidence does not sufficiently establish all material elements of the offense charged. *Nathan, supra* at 75, quoting 24 Tex.Jur.2d, Evidence, § 742, p. 422. Proof that amounts only to a strong suspicion or mere probability is insufficient. *Ford v. State*, 571 S.W.2d 924, 926 (Tex.Cr. App.1978).

The evidence upon which the State relies as sufficient to exclude every other reasonable hypothesis except appellant's guilt is summarized:

(1) Appellant accompanied the deceased in his car all afternoon of July 22, 1978, driving around, drinking beer, and visiting relatives.

(2) Appellant was the last person that any State's witness saw with the deceased prior to his death. There is evidence that time was around 6:00 p. m.

(3) The gun of the deceased was seen between the bucket seats in the car. Appellant admitted the gun was there. Death was by gunshot wounds.

(4) Appellant wore a bloodstained T-shirt to Mary's Bar and his jeans were wet.

(5) There was evidence that the deceased was murdered before appellant arrived at the bar.

(6) Appellant testified he arrived there at 6:15 while the State's witness said the time was 6:30. Discovery of the body was reported at 6:26, although the body was found about 6:00 or a few minutes earlier.

(7) Appellant was very nervous and shaking, according to witness Pena, when he arrived at the bar. He told her he had been in a fight.

(8) Pena testified he told her he wanted to get a new battery from the red car to sell. There was a new battery in the car, which leads to the inference that appellant knew where the car was parked at Woolco. Appellant denied telling Pena he wanted a new battery and that they went near Woolco.

(9) Appellant again became very nervous when he read a newspaper on Sunday morning.

(10) The investigator showed the physical possibility of driving from the crime scene, washing the carpet, parking the car and walking to the bar within the time frame.

In reviewing the evidence we note that appellant was never placed at or near the crime scene, nor at the Woolco parking lot with the red car. The two men were not shown to have been angry or quarrelling. There was no conclusive scientific evidence to show that the .22 caliber rifle, the gun owned by deceased which was never recovered, caused the death. The pathologist's assumption that the bullets he extracted at the autopsy were .22 caliber cannot have probative value, especially in view of the failure to introduce them into evidence. The spent casing found at the scene was introduced and then withdrawn from evidence. There is no expert evidence that the murder weapon, although never found, could have been a .22 caliber rifle.

Evidence established appellant's T-shirt became bloodstained on the night before the murder when he got a bloody nose and lip in a traffic accident. This is substantiated by hospital records and witness Dominguez. Tests determined that, although stains on the shirt were human blood, the blood could not be typed. The carpet could not be tested for blood origin. We cannot say without a doubt that the stains in the car were human blood.

Damaging evidence is Pena's statement of appellant's knowledge that the red car was located on the Woolco parking lot after the discovery of the deceased's body in another place. However, no fingerprints were taken from the automobile, which might

have shown that the appellant and deceased were the only persons who had driven the Firebird.

No attempt was made by the State to refute defense testimony explaining the reason for the presence of bloodstains on appellant's T-shirt. Nor was there any evidence to show that on the evening of the murder there were *wet* and *new* bloodstains on the T-shirt, not merely *dried* ones. There was no evidence that appellant was at the scene of the murder, if the scene actually was where the body was found.

Although there was variance in testimony as to the time of the sequence of events from immediately prior to 6:00 p. m. to 6:30 p. m. on July 22, 1978, the very brevity of that time casts strong suspicion on the appellant. This close proximity in time of the murder to appellant's arrival at Mary's Bar was a forceful factor in marshalling a case against appellant. But, without more, it cannot be enough for a conviction.

■ In ascertaining whether the guilt of the accused has been proved beyond a reasonable doubt, we find that the evidence does not establish all of the material elements of the offense charged. We find that the proof fails to show that appellant "did then and there knowingly cause the death of an individual, Anthony Valdez, Jr., by shooting him with a gun....." While all of the circumstances shown may very well amount to proof of strong suspicion or a probability that appellant committed the crime charged, the evidence does not exclude all other reasonable hypotheses except appellant's guilt. *Nathan v. State, supra* at 78. *Stogsdill v. State, supra* at 487. We hold the evidence is insufficient to sustain the conviction.

■ Once the reviewing court has found the evidence insufficient to sustain the conviction, a second trial upon the same charge is precluded by the Double Jeopardy Clause of the United States Constitution as applied to the states through the Fourteenth Amendment. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978). This state reviewing court has no alternative except to order the prosecution dismissed.

The judgment is reversed and the prosecution is ordered dismissed.