**William Louis BONDS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 56368.**

Court of Criminal Appeals of Texas, Panel 1.

Nov. 1, 1978.

Rehearing En Banc Denied Dec. 6, 1978.

Phil Burleson, Arch C. McColl, Dallas, for appellant.

Carol S. Vance, Dist. Atty., Alvin M. Titus and Ned B. Morris, Asst. Dist. Attys., Dallas, for the State.

Before ODOM, VOLLERS and W. C. DAVIS, JJ.

## OPINION

W. C. DAVIS, Judge.

A jury convicted the appellant of murder and assessed punishment at fifty years' imprisonment in the Texas Department of Corrections. We reverse and order a judgment of acquittal be entered in this cause.

The State relies upon circumstantial evidence. The appellant urges nine grounds of error, two concerning the sufficiency of the evidence, and four attacking the chain of custody of various State's exhibits. Because of their interrelationship with the challenge of the sufficiency of the evidence, we will discuss these grounds of error together.

The deceased, Marcus Ray Wilson, was a patient in Houston International Hospital, a psychiatric hospital which also treated drug abusers. He was discovered murdered in his bed in the hospital at 4:45 p. m. on April 26, 1976, by Ray Jarmin, a psychological technician. The deceased's face was "badly

bloody" and there was a (porcelain) soap dish with a towel around the handle hanging in a pool of blood next to him. A ball point pen was found nearby. Dr. Ethal Ericson, an assistant medical examiner for Harris County, performed an autopsy on the deceased the next day. In her opinion, the cause of death was "a skull fracture with lacerations, contusions, and hemorrhages of the brain." There were several superficial puncture wounds and a fresh scratch three-quarters of an inch long on the back of his left wrist. The appellant was the deceased's roommate in a three-bed room. The third bed was unoccupied and the soap dish in the shower of the deceased's room 328 was missing. The soap dish had been pulled from the showerstall wall. The appellant had been seen by Jarmin at approximately 4:25 p. m., lying in his bed, facing the wall, but Jarmin could not tell whether Bonds was actually sleeping.

Within thirty minutes of the discovery of the murder, the appellant, according to Jarmin, was sitting next to patient Gary Wayne Adams, in the day room, and, while ". . . most of them (patients) appeared somewhat tense, to a small degree, they were trying, more or less, to find out from the staff what was going on . . . the appellant remained on the couch facing the window with an expression that . . . was plain, he was just sitting there, no expression, just sitting there staring, I guess." The appellant was never placed in the company of the deceased between 4:15 p. m. and 4:45 p. m. by either Jarmin or another psychological technician who had seen Bonds in the room at 4:15 p. m. Jarmin noticed traces of blood on the appellant's left forearm. He couldn't tell if the blood was fresh, but "there were maybe three of four of them, two or three inches long," and blood spots, apparently about the size of a half-dollar on appellant's jeans. Jarmin directed a Mr. Randall and a Ms. Nixon to take Bonds to the fourth floor. All the patients were herded into the common area, day room, and the entire third floor area checked twice for bloody articles. Nothing was found. None of the other patients had any blood on them. Jarmin

testified that they had searched "very carefully," "behind and under the beds, pulled beds from the wall, lifted mattresses and looked under them." Patrol officers Bell and Rogers arrived after the appellant had been taken to the fourth floor. They stayed there "some time" and made their own investigation. "Later," bloody bedding was found in the empty bed of the deceased's room. Jarmin said that although "[i]t wasn't readily visible, it was easily found." He was not clear as to when the bloody bedding was found, but "probably after the uniformed officers left . . . the bloody blanket could have been placed there by someone after Bonds had been carried upstairs." Later, on re-cross, Jarmin testified that although he still couldn't recall if the "blanket was found after Rogers and his partner had made the investigation or before . . . it could have been subsequent to that time and sometime after Bonds had been removed from the floor."

According to Helen Jean Smith, the appellant was taken to the fourth floor by the head nurse and psychtech Abasolo. There she helped undress him and gave his clothes to officers Bell and Rogers. Significantly, Bell said that they left the hospital that night with only the soap dish and the ball point pen.

Frank Navarro, Jr., a patient next door to the patient's room, appeared tense at times. In contrast, the appellant was "quiet," "cooperative," "never seemed tense about anything . . . in other words, the whole time he was there, he was quiet, as far as the time he was on your floor," according to Jarmin.

Jarmin could not account for the disappearance of bloody towels wrapped around the deceased's head or the towel around the soap dish. He had not noticed writing on the wall over the deceased's bed until someone called it to his attention "later." (State's Exhibit # 24 purports to be a "poor photograph of the writing." Our copy is indecipherable.) Jarmin stated that there were two attendants on the third floor, but the nurses would come and go. There was a chart as to each patient's

whereabouts, but Jarmin did not "know where all of them (patients) was (sic) the whole shift." The third floor was segregated by sex with a common day room where all could watch television and listen to music. It was possible for them to "wander" to the other side, but if this happened an attendant would guide them back to the other side. The patients' rooms were not locked. Two lock-up rooms for troublesome patients were full that day.

Ms. Nixon, the shift head nurse, stated that the ward "census" which did not include the lock-up rooms was 16 patients, of which more were males than females. Some two hours after Bell and Rogers left, a housekeeper, whose name she could not recall, brought her the bloody bed linen (blanket and sheet) purported to have been found in the vacant bed in the deceased's room. Also, she received the apparently bloody pants which she had been told, but had no personal knowledge of, belonged to the appellant.

Wilbur Randall, another psychological technician, noticed some "slight marks of blood," approximately an inch or an inch and a half, on the appellant's arm. Randall said that Navarro appeared highly nervous after the deceased's body had been found. At approximately 4:15 p. m., Navarro had asked him for a change of clothing, but that "He was in his hospital uniform, and it was standard procedure for them to want to get back into their street clothes after 24 hours." Randall noticed no blood on Navarro.

Detective Tucker arrived at the hospital at 9:30 p. m. The deceased's room had been cleaned. He interviewed the appellant on the fourth floor and noticed blood on his bluejeans. At approximately 11:00 p. m., Ms. Nixon gave him the jeans. He also received a sheet, towels, and a blanket which he placed in the homicide lock closet to be submitted to the crime lab. He did not know who had recovered the sheet, towels, or blanket that were given to him or where they came from. He saw no cuts, scratches, abrasions or any fresh wounds on the appellant.

Detective Carpenter became involved in the investigation at approximately 8:00 a. m. the next day. He, too, examined the appellant and found no wounds. He received a vial purported to be the deceased's blood from a Mr. Hobbs at the morgue and delivered it to Mr. Zotter, the Houston police department chemist/toxicologist. Carpenter did not know of his own personal knowledge where Hobbs got the blood. Hobbs never testified. Carpenter arrested the appellant on April 30, 1976, at the hospital.

Detective Dunovan was also assigned to the case on April 27. He examined patient Navarro and found, in his opinion, some "shaving nicks" on his upper face and chin. This is on a ward where an electric razor was furnished for the patient's protection. Although it was not unusual for patients to use a razor with supervision, there is no testimony that Navarro had one. Detective Dunovan received some towels from a Nurse Reynolds with approximately 10–15 dime-sized blood stains. He did not know where or when she had obtained the towels. They were placed in the homicide lock closet. Nurse Reynolds did not testify.

A Mr. LaBlanc, a Houston police department latent fingerprint examiner, stated that he arrived at approximately 11:30 p. m. on April 26 and could only obtain prints from the window. They did not match the deceased's. He did not attempt to compare them with anybody else's, not even the appellant's. No prints were found on the soap dish or the ball point pen.

Detective Baker took the physical evidence from homicide to Mr. Zotter in the crime lab. Zotter testified that although the soap dish appeared to have blood on it he did not analyze it. The parties stipulated, "That the blood found in the bed around the deceased, Marcus Wilson, was type B blood." According to Zotter, type B blood was found in 8½% of all Caucasians and 17% of all blacks. The stains on the appellant's bluejeans and shirt were determined to be of type B blood, but Zotter had no personal knowledge whether they were in the same condition when he analyzed them

as when taken from the appellant. He had "just received them from Detective Baker." (The stains, when Zotter analyzed them, appeared to be "dollar-size.")

Zotter related that a heavy synthetic black fiber(s) was taken from one of the bloody sheets submitted to him. It did not match any fibers from the appellant's clothing, nor was a comparison made of the deceased's clothes. The fiber(s) was "just unmatched."

The vial of blood received from Detective Carpenter and purported to be from the body of the deceased was also type B. Again, Zotter had no personal knowledge of who took the vial from what body or from whom Carpenter got the vial. The blood stains on the towels which Nurse Reynolds had given to Detective Dunovan were analyzed to be type O blood. 44% of the population has type O blood. Navarro never testified. Ms. Nixon was recalled by the State. She related that it was not the hospital practice to get the patients' blood types. She stated that she had seen a *small* amount of blood on the garments; that the garments had been given to her after the incident; she couldn't recall by whom and she had no personal knowledge from whom they were taken. The garments were never shown to her at trial for comparison.

Marvin Thomas, a psychiatric technician at the hospital, testified that approximately 3 or 4 days before the homicide occurred the appellant had been transferred from the second floor to the admissions floor.

The appellant was observed in his room, which he shared with the deceased, 20 minutes before the murder was discovered. The room was equally accessible to at least 14 other patients, as well as numerous staff personnel. Some 30 minutes after the discovery of the offense, the expressionless appellant was observed calmly sitting in the day room peering out the window. Blood of undetermined type and origin was streaked on his forearm. Whether there was *blood on the appellant's pants, shirt, or both, and in what amounts varied according to the witnesses. One witness said she took appellant's clothes and gave them to a po-

lice officer. That police officer testified that he received the soap dish and the ball point pen only. A detective, who arrived after the officers left, stated that the appellant was still in his bluejeans and the detective was later given the clothes by a nurse who had no knowledge of their origin. A chemist/toxicologist did not know, and for that matter, no one else could ever tell, if the clothes he examined were the appellant's, nor, of course, if they were in the same condition when analyzed as when "taken" from the appellant. Leaving momentarily the clothing chain of custody problem, a vial of blood allegedly taken from the deceased is "matched" with the blood stains on the clothing. The stipulation admitted by the parties does not tell us deceased's blood type. In essence, the State "links" the appellant with the deceased with bloody garments of questionable origin and purity to a blood sample of unknown origin.

Additionally, towels of, again, unknown origin with type O blood stains are admitted apparently to exclude a patient who, it is apparently contended, has cut himself while shaving with, in all probability, an electric razor. The State's case is further discredited by the disappearance of bloody towels wrapped around the deceased's head and the "later" discovery of bloody bed linen and handwriting on the wall in the deceased's/appellant's room.

The failure of the State to analyze the blood on the soap dish, failure to compare fingerprints found on the window, failure to analyze the handwriting on the wall, and failure to match the fiber(s) on the bloody sheet do not strengthen this tenuous circumstantial case.

■ Critically, the evidence, even when considered in a *light most favorable to the verdict,* would seem to be simply blood on the appellant's forearm. We cannot write appellant's guilt on a "blank," "expressionless" face. *Suff v. State,* 531 S.W.2d 814 (Tex.Cr.App.1976). In C. McCormick's Handbook on the Law of Evidence, Sec. 212 at 527 (2nd Ed. 1972), it is stated:

"It will be readily apparent that where real evidence is offered an adequate foundation for admission will require testimony first that the object offered is the object which was involved in the incident, and further, that the condition of the object is substantially unchanged.

\*　\*　\*　\*　\*　\*

"On the other hand, if the offered evidence is of such a nature as to be susceptible to alteration by tampering or contamination, sound exercise of the trial court's discretion may require a more elaborate foundation. A foundation of the latter sort will commonly entail testimonially tracing the 'chain of custody' of the item with sufficient completeness to render it improbable that the original has either been exchanged with another or been contaminated or tampered with."

 It is unnecessary to dwell on the lack of chain of custody of appellant's garments, for the comparative "link," the vial of type B blood, was never, except for a hearsay assertion, linked to the deceased. Hearsay, of course, is without probative value. *Ex parte Martinez*, 530 S.W.2d 578 (Tex.Cr.App.1975); *Perkins v. Springstrun*, 557 S.W.2d 343 (Tex.Civ.App.—Austin, 1977, writ refused, n.r.e.).

Every circumstantial evidence case must necessarily be tested by its own facts to determine the sufficiency of the evidence to support the conviction. A conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the accused and proof amounting to only a strong suspicion or mere probability is insufficient. It is not necessary, however, that every fact point directly and independently to the guilt of the accused, and the cumulative force of all the incriminating circumstances may be sufficient to warrant a conclusion of guilt. *Stogsdill v. State*, 552 S.W.2d 481 (Tex.Cr.App.1977); *Flores v. State*, 551 S.W.2d 364 (Tex.Cr.App.1977); *Easley v. State*, 564 S.W.2d 742 (Tex.Cr.App.1978).

This Court has a duty of insuring that no one is convicted of a crime except upon proof beyond a reasonable doubt and, in a circumstantial evidence case, upon proof excluding all other hypotheses except appellant's guilt. *Easley v. State*, 529 S.W.2d 522 (Tex.Cr.App.1975). The evidence is insufficient to sustain the conviction for murder.

Having found that reversal must result, as the evidence is insufficient, the Supreme Court's decisions in *Burks v. U.S.*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), dictate that no further prosecution be had in this case.

The judgment is reversed and acquittal is ordered.