Ronald Paul WALLACE, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–83–025–CR.

Court of Appeals of Texas, Beaumont.

Sept. 7, 1983.

Mark Morefield, Daniel & Morefield, Liberty, for appellant.

Carroll E. Wilborn, Jr., Dist. Atty., Liberty, for appellee.

## OPINION

BROOKSHIRE, Justice.

Ronald Paul Wallace, Appellant, was charged by indictment with the offense of murder, it being alleged that on or about February 17, 1981, he did intentionally and knowingly cause the death of his father, Bobby Kenneth Wallace, by stabbing him with a knife. The Court appointed two attorneys to represent Appellant, and the record discloses the attorneys served Appellant ably and admirably.[1] The jury was charged with the law of circumstantial evidence, though such according to recent holdings is no longer required in Texas.[2] Instructions and charges were also given on the defense of insanity. The jury nonetheless found Appellant guilty and further assessed punishment at ninety-nine (99) years. Motion for new trial was overruled and timely notice of appeal was given.

Appellant, in his complaint of circumstantial evidence insufficiency, asserts that his mere presence at the scene of the crime does not justify drawing an inference that he participated therein, especially when he and his deceased father lived at the house, the scene of the crime, along with Appellant's sister, infant niece, and mother. Appellant further claims that such presence, coupled with flight, are not enough to conclude he committed the offense.

We agree with Appellant that, in certain fact situations, presence and/or flight from the scene of a crime are alone not enough to establish guilt. See *King v. State,* 638 S.W.2d 903 (Tex.Cr.App.1982); *Bonds v. State,* 573 S.W.2d 528 (Tex.Cr.App.1978); and *Culmore v. State,* 447 S.W.2d 915 (Tex. Cr.App.1969). In the instant case, however, we find other buttressing facts and circumstances that, taken with such presence and flight, warrant a conviction being sustained.

The testimony of Lisa Wallace Best, Appellant's sister, was as follows: On February 17, 1981, Appellant resided with his

1. The attorneys, L.J. "Boots" Krueger and Mark Morefield, both of Liberty, were, among other things, successful in suppressing a purported written statement given by Appellant and also negotiated from prosecutors an offer of a 15-year sentence for a plea of guilty, which Appellant declined before the Court, out of the jury's presence.

2. Trial commenced on July 20, 1981, and on or about that date a circumstantial evidence charge would have been required in cases based on circumstantial evidence. On March 1, 1983, the Texas Court of Criminal Appeals handed down its decision in *Hankins v. State,* 646 S.W.2d 191 (Tex.Cr.App.1983), which changed the requirement that such charge be given.

father, mother, Mrs. Best, and infant niece in Dayton, Liberty County. Appellant was home at about 7 a.m. on that date when the deceased, Bobby Kenneth Wallace, came home from working graveyards at the J.M. Huber Corporation. At that time, Appellant's mother was at work at the Brookshire Brothers Store in Liberty. It was usual for Appellant's father, after he came home from working such shifts, to close the door of the master bedroom and go to sleep dressed in his undershorts. Mrs. Best said that on the morning of February 17, 1981, Appellant seemed calm and nothing appeared to be bothering him, but there was one thing she thought was unusual—when she was in the bathroom she heard Appellant talking. The inference from this testimony, in light of Mrs. Best thinking it unusual, was that her twenty-year-old brother was either talking to himself or to imaginary characters, although Mrs. Best did concede that Appellant could have been talking with his father. Mrs. Best said she left Appellant and her father alone in the house at about 9:00 or 9:30 a.m. on that date when she went to visit a friend in Daisetta.

Michael Verner, an installer-repairman for Southwestern Bell Telephone Company, said that at about 11:30 a.m., February 17, 1981, he visited the Wallace home for the purpose of checking a noisy line and for replacing a temporary drop found on the ground at the rear of the house. He said that when he arrived he went directly to the terminal and then began following the drop. As he approached the house, a young man, eighteen to twenty years of age and dressed in jeans, came out of the rear patio door of the Wallace home. Verner said the young man seemed mad and upset, appeared hostile toward Verner, and made the repairman feel a certain amount of apprehension. Verner said the young man told him they were "having a fight" in the house and asked if the repairman could come back later. The repairman said he left immediately. Verner said he could not recognize in the courtroom the man who approached him.

Roy H. House, a building contractor, testified that on February 17, 1981, he was supervising the building of a house about 60 to 75 feet to the rear of the Wallace residence. Shortly after 1 p.m. on that date he was in a motor-coach that he uses as an office at construction sites. He heard a knock at the door of the motor-coach and when he opened it, a young man, whom he identified as Appellant, asked him: "Are you the man that's going to take me out of the country, or drive me away from here?" House said the young man had a "glazed eye", his speech was slurred, and he resembled one who was intoxicated. The young man had a "strange mannerism about him", House said. The building contractor told Appellant he thought he had the wrong party. He then observed Appellant turn and walk away. Appellant appeared to have lost weight at the time of trial, House said.

Donald Eugene Nichols, who lived across the street from the Wallace residence, also said that Appellant's appearance had changed from February 17, 1981, until the date of trial, in that Appellant had lost a considerable amount of weight. Nichols testified that at about 1:00 or 1:30 p.m., February 17, 1981, Nichols and his wife were on their front porch waiting for the mailman when they saw Appellant, whom they had known as their neighbor, walking down the road in a westerly direction away from the Wallace house. When Nichols first observed Appellant, Appellant was about 150 feet away, was by himself, dressed in blue jeans, walking fast and carrying suitcases. It struck Nichols as unusual for Appellant to be walking down the road, especially when the deceased's truck was parked in the driveway. Nichols said he had been checking his mail periodically that morning (the postman was running late) and he saw no one else at or near the Wallace residence that day.

Betty Joe Weisgarber, a housewife who lived about a half-mile west of the Wallace residence, said that between 1:00 and 1:30 p.m., February 17, 1981, she was driving to town when she passed, face to face, a stocky young man with blond hair and

wearing blue jeans and a red plaid shirt. The young man was walking down the road carrying two suitcases, one big and the other small. The small one resembled a man's toiletry bag. She said she had never seen the man before that date. She hesitated in her in-court identification of Appellant as the man she saw walking down the road. "[H]e's lost quite a bit of weight if that's him," she said. She did, however, note a resemblance in the face.

Both Mrs. Best and Florice Wallace, Appellant's mother, testified that they arrived in separate cars at the Wallace residence at about 4:00 or 4:30 p.m., February 17, 1981. Mrs. Best was with her two-year-old daughter, Stephanie Best, and Mrs. Wallace had with her Mrs. Wallace's mother, Natalie Freytag. They found the rear patio door of the house locked and this was unusual because Appellant was usually home that time of day. Mrs. Best crawled in through a kitchen window and, once inside, let in the others. Mrs. Wallace said when she entered she called Appellant's name and looked for him but he was not there. Mrs. Wallace then went into the master bedroom and found her husband's body on the floor. She said her husband looked as if he were dead and she called for her daughter. Mrs. Best said she noticed what appeared to be blood on her father's undershorts and on his body. The bedspread partially covered the deceased. Mrs. Wallace called the police and told them her husband had been murdered. The officers arrived in about 15 or 20 minutes, she said.

Mrs. Best testified that after the police arrived she noticed a four-pound sledge hammer sitting on the bar. The hammer belonged to her father and was normally kept in the garage. Mrs. Wallace testified that she observed a long butcher knife on the kitchen drainboard and the knife was normally kept in the kitchen drawer. Marvin Powell, who was a detective with the Liberty County Sheriff's Office, testified he found another butcher knife at the foot of the bed in the master bedroom. Mrs. Wallace said this second butcher knife was hers and normally was kept in a holder on the bar. Patricia Hulen, a forensic serologist

for the Texas Department of Public Safety, testified that blood found on both knives given to her for testing, was type O. Dr. Aurelio Espinola, forensic pathologist for the Harris County Medical Examiner's Office, said his examination revealed the deceased had type O blood. Danny Carter, latent fingerprint examiner for the Texas Department of Public Safety, said no usable fingerprints could be recovered from the knives.

Dr. Espinola said his autopsy of the deceased revealed stab wounds on the right and left sides of the chest, one stab wound on the back and one on the left arm. On the back of the left ear he found an oblique laceration which measured one and three-eighths inches in length and was the full thickness of the skull. The external genitalia, which he said included the scrotum sac and testes, were amputated. His opinion was that the amputation occurred after death. He said the presence of human semen in the rectum of the deceased indicated sexual intercourse. The stab wounds were consistent with the knives recovered by officers at the Wallace residence, he said. The oblique laceration behind the left ear could have been inflicted by the sledge hammer found at the scene. His opinion was that death was the result of the two stab wounds to the chest and one to the back. The wounds were not self-inflicted in his opinion. Time of death was between 9 a.m. and 5 p.m., February 17, 1981. He also said it took approximately six hours from the moment of death for rigor mortis to travel from the head to the right arm area of the body.

Terry Lee Bryant testified that on February 17, 1981, he was an Emergency Medical Technician and head-driver for the Liberty County Ambulance Service and was dispatched to the Wallace home. At the time he arrived, one police officer was present as were the wife and daughter of the deceased. He said he checked for signs of life and found none. There was rigidity on the right side of the deceased's body as if rigor mortis was setting in at the time. He said the arm could not be put down and this

caused problems in removing the body. The deceased had been dead for some time. He said the blood underneath the body was clotting and dry. He said Deputy Marvin Powell arrived approximately five minutes after he arrived.

Deputy Powell said he arrived at the Wallace residence at about 4:35 p.m. He said the ambulance attendants were present when he arrived. He conducted an investigation and determined that Appellant was not at the Wallace residence and was not to be found. There was no evidence of any forced entry into the residence, no evidence of burglary or robbery, and no representation made about anything being missing or stolen from the place.

Deputy Powell said that on March 4, 1981, he received information from the dispatcher that Appellant was seen entering the Wallace residence. He and other officers then went to the house with an arrest warrant, entered, called out Appellant's name, and arrested Appellant. On March 5, 1981, at the Liberty County Jail, Powell had a conversation with Appellant and, as a result of that conversation, drove with Appellant to Pasadena to look for the missing or cut-off portions of the deceased's body. The trip took a total of four hours and nothing was recovered.

■ In this case, we have viewed the record according to the "different standard of review in circumstantial evidence cases." *Wilson v. State,* 654 S.W.2d 465 (Tex.Cr. App.1983), 1983. See also, *Sewell v. State,* 578 S.W.2d 131 (Tex.Cr.App.1979). We refer to such standard of review by reference only for the sake of brevity and because such standard has been firmly delineated.

While mere presence at the scene of an offense and flight therefrom are not enough to sustain a conviction, they are circumstances tending to prove guilt which, when combined with other facts, may suffice to show the accused was a participant. *Thomas v. State,* 645 S.W.2d 798 (Tex.Cr. App.1983). See also, *Miller v. State,* 566 S.W.2d 614 (Tex.Cr.App.1978).

Here we think the circumstances point overwhelmingly to the guilt of Appellant. According to logical deductions from the testimony of the ambulance attendant and the opinion of the pathologist, death occurred at about 10:30 a.m., February 17, 1981. Appellant was left at home with the deceased at about 9:00 or 9:30 a.m. At about 11:30 a.m., a young man, who could have been Appellant, came out of the Wallace home and told the telephone repairman to come back later as a fight was going on at the residence. The victim was stabbed, portions of his body were removed, and anal intercourse was had. At approximately 1 p.m., Appellant knocked on the door of the motor-coach at the construction site and asked if the contractor were the man who was going to take him out of the country or away. At approximately 1:00 or 1:30 p.m., two neighbors of Appellant testified they saw Appellant, or someone close to his description, leaving the scene of the crime, one remarking that Appellant was walking fast. The wounds suffered by the deceased were not self-inflicted. Someone, presumably the murderer, left the back patio door of the Wallace residence locked, thus tending to show that the murderer was someone who had dominion or control over the premises (Why would an outsider have bothered to lock the door behind him?). The whereabouts of all other inhabitants of the premises were explained. There was no evidence of forced entry, or of burglary or robbery, or of anything missing. The wounds on the body of the deceased could have been caused by knives and a sledge hammer belonging at the Wallace home. Blood was found on the knives and it matched the blood-type of the deceased. Apparently and logically, the knives and sledge hammer were the weapons used in the murder and, importantly, these came from the Wallace home and not from without. We think it insignificant in this case that no fingerprints were lifted from the sledge hammer or knives. Indeed, had fingerprints of Appellant been recovered from the purported weapons, such would have been of little probative weight, if any, because Appellant lived in the house, the scene of the crime,

and his fingerprints on such implements would not have been unusual. The deceased was found in his undershorts in his bedroom with part of the bedding thrown over him, thus tending to show, although admittedly only slightly, that the murderer was not a stranger to the household. We do not think the failure of in-court identification by one witness or the shakey in-court identification given by another is significant in light of the fact that Appellant was at an age when physical appearances change rapidly and especially in light of undisputed testimony that Appellant had lost considerable weight from the date of the offense to trial. Certainly there are enough buttressing facts and circumstances to sustain the conviction. Here the facts are in such juxtaposition to one another that only one logical conclusion may be drawn therefrom—guilt. See *Barker v. State,* 168 Tex.Cr.R. 513, 329 S.W.2d 889 (1959).

■ Going beyond, however, an examination of the relationship between the parties is in order. In all prosecutions for murder, the State or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense. Tex.Penal Code Ann. § 19.06 (Vernon 1974). We think such previous relationship existing between Appellant and the deceased, together with other facts and circumstances concerning Appellant's condition of the mind, are circumstances which go even beyond those above to exclude every other reasonable hypothesis except that of guilt of Appellant. See *Barron v. State,* 566 S.W.2d 929 (Tex.Cr.App.1978).

■ Mrs. Wallace said Appellant and her husband had not gotten along for quite a number of years because of Appellant's use of drugs and his failure to work. Sometimes the father and son would hit each other, she said, and in every exchange that she saw, the son was the aggressor.

Appellant's mother said further: that on February 6, 1981 (a date not remote to the incident in question), she came home from work at about 7:30 p.m. and Appellant told her he was going to kill his father and mother at 11:30 p.m. that night. Appellant kept looking out the rear patio door and said there was a cult outside to whom he was talking. Appellant would say, "No, no, I'm not going to do it," and then he would lapse into vulgar language. At about 11:20 p.m., Appellant told his mother she had better leave. Mrs. Wallace then went into the bedroom and awakened her sleeping husband. The two crawled out the bedroom window and spent the remainder of the night at a motel.

Mrs. Wallace continued: On the next morning, February 7, 1981, Appellant seemed better. The mother told Appellant she thought he needed to see a doctor and at first he said "Yes". Later, after she had spoken with the deceased about Appellant seeing a doctor, Appellant changed his mind and said nothing was wrong with him. On Monday, February 9, 1981, she went to the Liberty County Courthouse to talk to the County Attorney and County Judge about having her son committed due to mental illness. Papers were drawn and she signed them. On February 11, 1981, officers came to the Wallace home to pick up Appellant. Mrs. Wallace had a suitcase packed for Appellant when the officers arrived. The mother confronted her son, saying she was having him committed to the Rusk State Hospital because she thought something was wrong with him. The officers tried to explain to Appellant that they were taking him for his own good, but he said nothing was wrong with him and he refused to go. Appellant then went into another room and brought out some knives. In connection with the knives, Appellant stated the officers weren't going to take him alive. Mrs. Wallace believed Appellant threatened the officers because she remembered asking them to back off because she didn't want anyone hurt. The officers called for assistance, but the back-up officers remained outside. The deputies offered to overpower

Appellant, but the mother was afraid because Appellant had the knives. Mrs. Wallace asked the officers to try again another day and they agreed.

Because of Appellant's use of drugs and failure to work, there was a history of violence with the deceased. Scarcely more than a week before the murder, Appellant had threatened to kill his parents—a threat his parents perceived as so real that they crawled out the bedroom window and left for the night. Appellant had also threatened police officers when they came to take him to the Rusk State Hospital. Appellant, at the time of the threat to the officers, demonstrated an attraction to household knives as weapons.

Appellant points out the inconsistency in testimony where, on the one hand, Nichols said he thought it strange to see Appellant walking down the road when the deceased's truck was parked in the driveway, and where, on the other, it was said Mrs. Best was away at the time in the truck visiting friends. The way we read the record, we feel that Nichol's reference to the truck was passing in nature. In any event, in a circumstantial evidence case the state need not present evidence excluding every conceivable hypothesis except that of defendant's guilt, it need only present evidence excluding every reasonable hypothesis. Each fact need not point directly and independently at the guilt of the accused, as the cumulative effect of all the incriminating facts may be sufficient to support the conviction. *Hooker v. State,* 621 S.W.2d 597, 601 (Tex.Cr.App.1981). Further, we see no hypothesis that could be conceived in the testimony about the truck, or for that matter, in the lack of fingerprints on the sledge hammer and knives or in the identification testimony.

No other reasonable hypothesis exists except the guilt of the accused.

AFFIRMED.